FILED BY _____ D.C.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

05 OCT -4 AM 7:19

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

| | | |
|---|---|---|
| INTERMODAL CARTAGE, CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-2804 Ml/A |
| | ) | |
| NATUZZI AMERICAS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

### OPINION AND ORDER FOLLOWING NON-JURY TRIAL

---

Plaintiff, Intermodal Cartage, Co., brings this suit against Defendant Natuzzi Americas, Inc., alleging that Defendant failed to pay Plaintiff for services rendered in breach of the parties' contract.  The Court held a bench trial in this case on December 20, 2004.  Plaintiff was represented by Raul I. Mendelson, Esq., Alan Kleiman, Esq., and Halle Mitchell, Esq.  Defendant was represented by Paul Howard Morris, Esq.  Five witnesses testified at the trial: William Coleman, Thomas Puckhaber, and Christopher Moore, all employees of Plaintiff Intermodal, and Martin Sis and Margaret (Peggy) Diamond, employees of Defendant Natuzzi.  For the reasons set forth in this opinion, the Court finds that Defendant breached the contract between the parties.  Accordingly, judgment is ENTERED in favor of Plaintiff against Defendant in the amount of $106,811.60, plus attorney's fees of thirty three per cent of the outstanding balance, plus interest.

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on  10-4-05

39

## I.    Findings of Fact

1. Defendant Natuzzi is a corporation doing business in the state of North Carolina.  Among other things, Defendant is in the business of shipping goods from Brazil, China, Romania, and Italy to customers in the United States, Canada, Central and South America, and surrounding islands.

2. Defendant's customer, Rich's Department Store ("Rich's"), is a division of Federated Department Stores and is located in Stone Mountain, Georgia.

3. Defendant contracts with ocean carriers to deliver the goods from foreign ports of origin to various ports in the United States.

4. Defendant contracts with trucking companies in the United States to deliver the goods from the port to the customer.

5. Plaintiff Intermodal Cartage, Co. is a trucking company specializing in container drayage in the Southeastern United States, with its principal office in Memphis, Tennessee.

6. Two types of delivery are at issue in this case.  A "live unload" is a transaction in which the carrier delivers a container to the customer, waits up to two hours for the container to be unloaded, and then brings the same container back to the port or container yard.  In contrast, a "drop and switch" requires the trucker carrier to transport a container of goods to the customer, leave that container with the customer for

-2-

unloading, pick up a second empty container which had been dropped off previously, and then return the empty container to the shipping carrier.

7. On March 25, 2002, Tommy Puckhaber, Assistant Manager of Plaintiff's facility located in Charleston, S.C., emailed Defendant's Director of Transportation, Martin Sis, to solicit Defendant's trucking business. (Ex. 1.)

8. Defendant, on the same date, faxed to Plaintiff a letter requesting a quotation for Plaintiff's services.  Attached to Defendant's letter was a spreadsheet, entitled "Natuzzi Americas Southeast Inland Delivery Analysis."  (Ex. 2.)  The spreadsheet listed the locations and shipping requirements of Defendant's customers.  The spreadsheet noted that Rich's "requires drop & switch." (Id.)

9. On March 27, 2002, Mr. Sis emailed to Plaintiff a proposed Letter of Agreement for review.  (Ex. 12.)

10. In April and May, 2002, Plaintiff and Defendant continued to discuss starting a business relationship whereby Plaintiff would deliver goods for Defendant.  On April 11, 2002, Plaintiff emailed Defendant with corrections to be made to the proposed Letter of Agreement and requested that Defendant complete Plaintiff's Application for Credit.  (Ex. 15.)

11. On May 31, 2002, Defendant completed and signed Plaintiff's Application for Credit and returned it to Plaintiff.

-3-

(Ex. 4.)   Renee Hooks, Defendant's controller at the time, signed the Application for Credit.   The Application for Credit referred to the "General Rules and Provisions of IMC's Tariff" and stated that charges, including "Per Diem Responsibility," are governed by the tariff.   (Id.)

12. The tariff provided that payment of per diem charges on marine containers accrue at a rate of $60.00 per day, to begin after six "free days" at no charge. (Ex. 4 ¶ 145.)   The tariff also provided that charges not paid within 30 days from the date of billing are subject to an interest rate of one and one-half percent, to be computed every thirty days.   (Ex. 4 ¶ 110.)

13. Defendant sent another proposed Letter of Agreement to Plaintiff on June 6, 2002.   The Letter of Agreement was never signed by either party.   (Joint Pretrial Order at 5.)

14. On June 17, 2002, Defendant issued the first Delivery Order to Plaintiff.   (Id.)

15. Through the remainder of 2002 and early 2003, Defendant issued Delivery Orders to Plaintiff requesting that Plaintiff pick up containers full of goods from the port in Charleston and deliver them to its customers, including Rich's in Georgia.

16. During the course of the parties' relationship, Plaintiff shipped 72 containers to Rich's at Defendant's request. Forty-one of those containers accrued per diem charges.

17. Defendant first discovered that it was being charged for

-4-

overdue marine containers on January 13, 2003[1], when Ms. Diamond received invoices from Plaintiff with per diem charges.

18. Defendant did not realize until January 28, 2003, that the spreadsheet it had sent to Plaintiff listed Rich's as requiring drop and switch shipments.  Defendant contacted Plaintiff on this date and notified Plaintiff to cease performing drop and switch deliveries to Rich's and to treat all deliveries as live unloads unless it received prior authorization from Defendant.  (Ex. 18.)

## II.  Conclusions of Law

"The rights and obligations of contracting parties are governed by their written agreements."  <u>Vanderbilt v. DiNardo</u>, 174 F.3d 751 (6th Cir. 1999).  All contracts that are "in writing and signed by the party to be bound . . . shall be prima facie evidence that the contract contains the true intention of the parties, and shall be enforced as written . . . ."  Tenn. Code Ann. § 47-50-112.

The burden of providing the evidence and terms of a valid contract is upon the party relying on the alleged contract.  <u>Randolph v. Randolph</u>, 937 S.W.2d 815, 821 (Tenn. 1996).  The party must prove that a "meeting of the minds of the parties in mutual assent" and consideration existed.  <u>Doe v. HCA Health</u>

---

[1] Ms. Diamond's administrative assistant had seen the invoices earlier, but delivered them to Ms. Diamond on January 13, 2003.

Services of Tennessee, Inc., 46 S.W.3d 191, 196 (Tenn. 2001).
Mutual assent and a meeting of the minds cannot be accomplished
by the unilateral action of one party nor by an ambiguous course
of dealing.  Davidson v. Holtzman, 47 S.W.3d 445, 453-54 (Tenn.
Ct. App. 2000).  "An enforceable agreement also requires
consideration flowing to both parties."  Frank Rudy Heirs
Associates v. Moore & Associates, Inc., 919 S.W.2d 609, 613
(Tenn. Ct. App. 1995).  "All contracts in writing signed by the
party to be bound, or the party's authorized agent and attorney,
are prima facie evidence of consideration."  Tenn. Code Ann. §
47-50-103.

### A. Contract Liability

The Court finds that Plaintiff has met its burden of proving
that the Application for Credit and General Rules and Provisions
of Plaintiff's Tariff constitute a valid and enforceable contract
between the parties.  The Application for Credit was signed by
Defendant's controller, Renee Hooks.  As Defendant's employee and
head of its accounting department, Ms. Hooks had actual authority
to bind Defendant.  A principal is generally "bound by its
agent's acts done in its behalf and within the actual or apparent
scope of the agency."  White v. Revco Discount Drug Centers, Inc.
33 S.W.3d 713, 723 (Tenn. 2000) (citation omitted).  In addition,
the Application for Credit specifically referred to and
incorporated the terms of the General Rules and Provisions set

-6-

forth in Plaintiff's tariff.  The Application for Credit states, "I FURTHER CERTIFY THAT I HAVE RECEIVED AND READ THE REVISED GENERAL RULES AND PROVISIONS OF IMC'S TARIFF AND UNDERSTAND THAT TERMS AND CONDITIONS INCLUDING BUT NOT LIMITED TO PER DIEM RESPONSIBILITY . . . ARE GOVERNED BY THIS TARIFF (THE GENERAL RULES AND PROVISIONS ARE AVAILABLE AT www.imcg.com)."  The clear, unambiguous language of the Application for Credit demonstrates that the Application effectively incorporated the terms of Plaintiff's tariff, and the parties validly formed a contract set forth in the Application for Credit and the tariff.

The Court finds that there was a meeting of the minds and consideration sufficient to create a contract.  The parties agreed to create a rate agreement to govern their dealings. Plaintiff agreed to extend credit to Defendant in the event that Defendant chose to request delivery services.  The parties settled on the basic terms of the agreement, Defendant's customers to be serviced, and the delivery requirements at each location.  In addition, it is clear to the Court that there was consideration for the contract.  Each party incurred a legal detriment sufficient to act as consideration to create a binding contract.  Plaintiff agreed to provide services to Defendant, and Defendant agreed to pay Plaintiff for those services.  Thus, the Application for Credit, along with Plaintiff's tariff, constituted a contract binding on both parties.

Neither the application for credit nor the tariff explicitly set forth the type of shipments involved under the contract. Where terms are not provided, supplemental material can be used to explain contract terms. While "parol evidence cannot be admitted to contradict or vary the terms or to enlarge or diminish the obligation of a written instrument or deed . . ." Clayton v. Haury, 452 S.W.2d 865, 867-68 (Tenn. 1970), the parol evidence rule does not bar the use of extrinsic information to supplement the terms of a contract. Cagle v. Wheeler, 242 S.W.2d 338, 341 (Tenn. Ct. App. 1951).  In the absence of any specific terms governing the type of shipments to be sent to Rich's, Plaintiff correctly relied on Defendant's spreadsheet.  (Ex. 2.) Defendant sent Plaintiff the spreadsheet on the first day of their relationship to specify the shipping requirements at each of its customers' sites.  Plaintiff correctly followed the instructions given in the spreadsheet to perform drop and switch deliveries to Rich's.

The incorrect terms Defendant supplied regarding the method of delivery to Rich's did not invalidate the contract.  A unilateral mistake does not void a contract.  A "unilateral mistake in the making of an agreement, of which the other party is entirely ignorant and to which he in no way contributes, will not affect the agreement or afford ground for its avoidance or rescission, unless it is such a mistake as goes to the substance

-8-

of the agreement itself." <u>Cofrancesco Const. Co. v. Superior</u> <u>Components, Inc.</u>, 371 S.W.2d 821, 824 (Tenn. Ct. App. 1963) (quoting 12 Am. Jur. <u>Contracts</u> § 133). This mistake did not go to the substance of the agreement. Plaintiff and Defendant successfully agreed on the various customers to service, the delivery locations of those customers, and the rates to be charged. The mistake as to the specific shipment method required for one particular customer is insufficient to invalidate the contract.

Defendant contends that even if the spreadsheet initially controlled the shipping method, Defendant's delivery orders that it began using in August, 2002 should control from that point onward. Defendant's initial delivery orders contained no information about the method of delivery for each shipment. However, the new delivery orders stated at the bottom of the page: "Unless prior written approval from Natuzzi is received, the container listed is a two-hour live unload. Additional charges are UNAPPROVED, contact Natuzzi for further assistance." (Ex. 16.) It is unclear which delivery order forms were used in the later part of the parties' relationship. The version used, however, does not affect the parties' obligations under the contract. As set forth above, the parties were bound to the terms of the contract and to the rate listings set forth in Defendant's spreadsheet. Under the terms of the spreadsheet,

-9-

Rich's was a drop and switch customer. Defendant could not later unilaterally switch the terms of the contract by utilizing new delivery orders that materially changed the contract. Modification of an existing contract cannot be accomplished by the unilateral action of one of the parties. <u>Balderacchi v. Ruth</u>, 256 S.W.2d 390, 424-45 (Tenn. Ct. App. 1953). There must be the "same mutuality of assent and meeting of minds as required to make a contract [and] new negotiations cannot affect a completed contract unless they result in a new agreement." <u>Id.</u> There is no evidence in the record to suggest that Plaintiff ever assented to the terms of the new delivery orders or signed an agreement to that effect. Thus, the Court finds that regardless of the delivery order used, the contract between the parties called for drop and switch deliveries to Rich's.[2]

Defendant contends that the Letter of Agreement it sent to Plaintiff supercedes any other communications and is binding on the parties. The Letter of Agreement was never signed by either party. The parties did submit different drafts of the letter during the first few months of their relationship. However,

---

[2] There is a question as to whether Plaintiff fully satisfied the terms of the contract. While Plaintiff has submitted substantial evidence showing that it delivered marine containers to Rich's, it has not put forward any evidence that it picked up an empty container during that transaction, as required under a drop and switch contract. However, the parties have not submitted proof on this issue, and the Court finds that this is not material to the dispute at hand.

there is no evidence that the parties ever came to an agreement on the letter or that they intended it to be binding.  In the absence of any evidence of a meeting of the minds regarding the Letter of Agreement, the Court finds that this document is not controlling as to the parties' obligations.

### B. Damages

The Court having found that the Application for Credit was a binding contract, it holds that Defendant is liable for damages for breach.  Under the terms of the contract, Plaintiff substantially performed by making drop and switch deliveries to Rich's.  Defendant is liable for the per diem charges that accrued on the marine containers left at Rich's, pursuant to the terms of the contract between the parties.

Defendant contends that it should not be held liable for deliveries made after its notification to Plaintiff on January 28, 2003, of its requirement to have live unload deliveries. Plaintiff concedes this point.  Accordingly, Defendant is not liable for the per diem charges on the containers Plaintiff delivered to Rich's on February 3, 2003, corresponding to invoice numbers M96-102396 and M96-102515.

Defendant is liable for the per diem charges that accrued on containers from prior deliveries that remained at Rich's after January 28, 2003.  The Court finds that Plaintiff had no obligation under the contract to remove the containers.

-11-

Plaintiff simply had an obligation under the contract to take an empty container and return it to the marine shipper each time it delivered a full container.  However, even if Plaintiff did have an obligation to return all of the containers it delivered back to the shipping port, Plaintiff performed that obligation. Plaintiff recovered and returned all containers to Maersk by March 18, 2003, less than two months after the notification of Defendant's mistake.  This was a reasonable amount of time in which to retrieve the containers.  Had Defendant been concerned about the outstanding containers, it should have made alternative arrangements to ensure prompt return to Maersk.

The parties contest the relevant version of Plaintiff's tariff to apply to this contract.[3]  The Application for Credit refers both to "Revised General Rules and Provisions" and to "General Rules and Provisions."  The parties have not supplied the Court with any document entitled "Revised General Rules and Provisions."  Plaintiff contends that the version attached to Exhibit 4, with an effective date of September 1, 2000, governed the contract between the parties.  Defendant contends that the version attached as Exhibit 7, faxed to the Rosman Adjustment Company on December 1, 2003, should apply.  The material terms of

---

[3] The current version of Plaintiff's rules posted on its website lists an effective date of June 14, 2004, and thus this version does not apply to the case at bar.  See Motor Freight Rules Circular, available at http://www.imcg.com/Tariff-RulesCircular.pdf.

-12-

the tariffs are the same except for the provision regarding
attorney's fees.

The Court finds that the tariff in Exhibit 4 applies to the
contract between the parties.  Just beneath the title of the
document, it states, "Effective Date: September 1, 2000."  (Ex. 4
at 2.)  Thus, this particular tariff would have been in force at
the time of the parties' contract negotiations and would have
applied to supply the terms of the Application for Credit unless
superceded by a later version.  The version cited by Defendant in
Exhibit 7 does not list an effective date for the terms, nor does
it specify when the tariff was created.  There is no evidence to
show who created this version of the tariff or when, and, as
such, the Court finds that there is insufficient support to prove
that it was in force at the time of the contract.  Thus, the
Court finds that the version in Exhibit 4 governs this contract.
Defendant is liable for attorney's fees of thirty-three per cent
of the outstanding balance, as per the tariff in Exhibit 4.  (Ex.
4 ¶ 115.)

## III. Conclusion

For the foregoing reasons, the Court finds that Plaintiff
performed fully under the contract and complied with the contract
by performing drop and switch deliveries to Rich's.  Accordingly,
the Court enters judgment in favor of Plaintiff as to Plaintiff's
breach of contract claim for all deliveries made before January

-13-

28, 2003, in the amount of $106,811.60[4], plus interest of one and one-half percent accruing every 30 days after billing, plus thirty-three percent of the total outstanding balance in attorney's fees.

ENTERED this 3rd day of October, 2005.

JON P. McCALLA
UNITED STATES DISTRICT JUDGE

---

[4] This figure equals the outstanding balance of $110,253.00 after 14 free days (see Ex. 11), minus $513.00 from invoices M96-102396 and M96-102515 from containers picked up by Plaintiff after January 28, 2003, minus $2,928.40 already paid by Defendant by check # 150257.

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 39 in case 2:03-CV-02804 was distributed by fax, mail, or direct printing on October 4, 2005 to the parties listed.

---

Paul Howard Morris
MARTIN TATE MORROW & MARSTON
6410 Poplar Ave.
Ste. 1000
Memphis, TN 38119

Paul I Mendelson
MENDELSON & BAILEY
799 Estate Place
Memphis, TN 38187--023

Mark Daniel Griffin
MARTIN TATE MORROW & MARSTON
6410 Poplar Ave.
Ste. 1000
Memphis, TN 38119

Honorable Jon McCalla
US DISTRICT COURT